No. 35,207

John F. Higgins, *Appellant,* v. The Board of County Commissioners of the County of Johnson, Louis O. Krumm, as Chairman, Ollie Turner and L. R. Penner, as Commissioners, and Leonard White, as County Clerk, Etc., *Appellees.*

(112 P. 2d 128)

Opinion filed April 12, 1941.

*Herbert L. Lodge,* of Olathe, for the appellant.

*Frank D. Hedrick, Jr.,* county attorney, *John W. Breyfogle, Jr.,* and *Howard E. Payne,* both of Olathe, for the appellees.

*A. B. Mitchell,* assistant attorney general, as *amicus curiae.*

The opinion of the court was delivered by

Allen, J.: The sole question presented on this appeal is the constitutionality of a statute effective on the 7th day of February, 1941, entitled "An act relating to airports in certain counties, and providing for the purchase and maintenance thereof."

The statute provides:

"Section 1. This act shall apply only to such counties in the state as shall border on or be contiguous to two cities, each of which shall have a population of more than 115,000 and located either within or without the state of Kansas.

"Sec. 2. Such counties for the purpose of coöperating with the federal government in the establishment of public airports as a part of the national defense program are hereby authorized, through the board of county commissioners of said county, to issue the bonds of said county, which bonds shall be a general obligation of the county in the amount and manner hereinafter provided, and to sell said bonds in the manner provided by law, and to use the proceeds derived therefrom for the purchase of lands required and necessary for the establishment of an airport, and for the payment of such necessary and legal expenses incidental thereto as may be required in order to acquire said lands upon which said airport is to be located.

"Sec. 3. That before the issuance of said bonds for said purposes as aforesaid, the board of county commissioners of said county shall by resolution

declare to be necessary the establishment of an airport and the issuance of bonds to pay said costs as aforesaid, and clearly define the purpose for which said bonds are to be issued and the amount thereof, which said resolution shall be published once in two newspapers of general circulation in the county, and such bonds shall not be issued if within ten days after the publication of said notice a petition or petitions shall be filed with the county clerk signed by at least twenty percent of the qualified electors of each of the commissioner districts of said county protesting the issuance of such bonds. In determining the sufficiency of such protest or the number of voters required to sign said protesting petition or petitions, the total vote cast in such commissioner districts for secretary of state at the last general election shall be used as a basis.

"Sec. 4. All bonds issued under the provisions of this act shall be issued in accordance with the provisions of the general bond law, and the aggregate amount of bonds so issued shall not exceed one-quarter of one percent of the assessed tax valuation of the tangible taxable property of such county as shown by the records and books of the county clerk at the last preceding assessment.

"Sec. 5. For the purpose of acquiring any necessary land or rights of way over the same, necessary for the establishment of such airport, if the board of county commissioners cannot agree with the owner as to the price to be paid therefor, condemnation procedure may be instituted by said board and prosecuted in the name of the county, under the provisions of the general provisions of the law relating to condemnation.

"Sec. 6. Upon the establishment of an airport and the acquisition of the land required therefor as aforesaid, the board of county commissioners hereby is authorized to operate and maintain and to make such reasonable rules and regulations governing the conduct and operation, maintenance and care of said airport as may be necessary for the best interests of the county and general public, and is authorized to enter into leases and contracts with the federal government or any of its agencies, pertaining to the use of said airport, conduct and operation, as may be necessary in order to coöperate with the federal government as a part of the national defense program, and further is authorized to make such reasonable rules and regulations and to enter into contracts and leases with private individuals and persons, so long as the same does not interfere with the use of said facility by the federal government, or its agencies, and so long as said rules and regulations are not unjustly discriminatory.

"Sec. 7. That for the purpose of equipping, improving, operating, maintaining and regulating said airport, and all things incidental thereto, said board of county commissioners hereby is authorized to levy an annual tax not to exceed one-eighth mill per year, which said tax shall be in addition to all specific and aggregate levies authorized or limited by law for county purposes."

The plaintiff, a taxpayer of Johnson county, in his petition alleged the act is unconstitutional and void for the reason that it is in contravention to section 17, article 2, of the constitution; that pursuant to the terms of the statute the defendants, the board of county com-

missioners, on February 10, 1941, adopted a resolution signifying their intention to issue the bonds of the county in the sum of $73,000 for the purpose set forth in the statute, and would, if not restrained, levy an annual general property tax to retire the bonds and pay the interest thereon, and prayed for an order restraining the defendants from proceeding further in the matter. A temporary injunction was issued and a hearing set for February 17, 1941. An answer was filed and a hearing had. At the trial testimony was introduced and an agreed statement of facts submitted.

The court made findings of fact and returned conclusions of law. The court found that the plaintiff is a bona fide resident of Johnson county and was a proper party to institute the action; that the defendants, as officials of Johnson county, are threatening to and intend to proceed with the issuance of the bonds and to the performance of all the duties required by the statute. The court further found:

"12. Johnson county, Kansas, is the only county within the state of Kansas which 'borders on or is contiguous to two cities, each of which have a population of more than 115,000, and located either within or without the state of Kansas,' and no other county in the state of Kansas is so situated. There is no reasonable probability that any other county in Kansas will ever be situated so that it will be classified under the special provisions of section 1 of said act.

"13. The two cities to which Johnson county, Kansas, is contiguous are Kansas City and Kansas City, Mo., each having a population of over 115,000 and in each of said cities are located major improved airports, all of which are accessible to Johnson county, Kansas, and the location of the airport proposed to be established under the provisions of said act within Johnson county.

"14. There exists at the present time a great emergency in our nation, which is both national and international in its scope and extent, and in recognition of which, and by reason thereof, the Congress of the United States passed an appropriation bill of forty million dollars for the establishment of about two hundred public airports, the locations of which were to be designated by the proper administrative authorities of the federal government, such locations to be selected and designated only upon tracts of land which were respectively owned by some governmental subdivision which would be compared [empowered] to make the same available to the federal government free of cost to it for the items of the purchase price and maintenance expenses thereof.

"A site for the establishment of one of said public airports has been designated by said federal authorities for the establishment of one of said units within Johnson county, Kansas, and when the same is made available to the federal government will proceed without delay to the erection of those facilities required for the proper use of the same in the federal government's emergency defense program, provided, however, that said site is made thus avail-

able to the federal government not later than on or about March 1, 1941. In event that said site is not available to the federal government at said time, there will be an abandonment thereof for the purposes now contemplated.

"The Kansas legislature, at the time of the enactment of Senate bill No. 37 into law, had all of said facts before it at the time of its consideration and passage of said act, and the handling and the passage of said bill was done without any undue delay whatsoever on the part of both branches of the Kansas legislature and the governor of Kansas in his signature and approval of said act, all with the specific aim and purpose of full coöperation on their part with the national government's emergency defense program as the same related to the establishment of said public airport upon the site selected in Johnson county. And it was shown by the legislature in the passage of said act, and by the governor at the time he approved and signed the same, that said act was a special emergency law which did not apply to nor affect or involve any other county in the state of Kansas than Johnson county; that at all such times it was not the intent of the legislature or the governor that said act would apply to or affect any other county in Kansas than Johnson county.

"15. The federal government has allocated the sum of $188,000 of its funds for the construction and improvement of the airport that is contemplated that will be located on the land which the issue of the said bonds of Johnson county are to purchase under the provisions of said act of the Kansas legislature. It was for the purpose of assisting and supporting the defense program of the federal government that the said act was passed by the Kansas legislature.

"The location of the site of the proposed public airport was selected in Johnson county by the act and choice of the duly authorized agencies of the federal government, subject to the purchases of such site by Johnson county, through the action of the board of county commissioners of said county. And the legislature of Kansas, in enacting said Senate bill No. 37 into law, had in mind that the same was a 'special bill,' applying only to Johnson county, and that it did not apply to any other county in the state of Kansas, and as such it was not contrary to nor repugnant to section 17, article 2, of the constitution of the state of Kansas; that it was not the intent and purpose of the legislature of Kansas to enact said Senate bill No. 37 as a law of 'general nature which have uniform operation throughout the state'; and that by reason of all of the special circumstances involved herein, that no general law that would or might be attempted to be passed by said legislature could or would be applicable to the emergency requirements and special needs of the national defense program, but that the same required the passage of a special emergency act by the Kansas legislature that would be coöperative therewith; that the enactment of said Senate bill No. 37 was and is as descriptive of Johnson county only, as if the same had been specifically designated therein by name, and does not apply to nor affect any other county in the state of Kansas; that the time limitation involved for the completion of the program of coöperation between the federal government and Johnson county for said national defense unit is very short and will expire on or about March 1, 1941.

"16. The court finds from the pleadings filed herein, and from the 'agreed statement of facts' which have been duly submitted to the court, and from the

evidence given in the trial of this cause, that in the great national and international emergency, which has existed for many months, and which still exists, and that, as a direct result thereof, the conditions under which the legislature met for the consideration of Senate bill No. 37 'were unprecedented in modern history'; the circumstances which have been created by and through the said 'emergency' were such as to fully warrant and justify the passage of the act of the legislature, as contained in said Senate bill No. 37, as special legislation, to accomplish the desired and necessary ends.

"17. The court finds that under the terms, conditions and limitations of said act, and the specific purposes for which the same was passed by the Kansas legislature, that the same cannot be considered, by or through the remotest probability or possibility or speculation, to be made to apply to any other county in the state of Kansas than Johnson county.

"18. The population of Kansas City is in excess of 115,000, and the city limit of said city borders on and is immediately contiguous to the northern border of Johnson county; said city is within the state of Kansas; the population of Kansas City, Mo., is in excess of 115,000, and the city limit of said city borders on and is immediately contiguous to the eastern border of Johnson county; said city is outside of the state of Kansas. Said two cities come within the classification mentioned in section 1 of said act. There are, in fact, no two other cities having a population of over 115,000 which border on or are contiguous to any other county or counties, in the state of Kansas."

Paragraph 4 of the conclusion of law states:

"Said Senate bill No. 37, which was enacted into law by the legislature of Kansas, and was duly approved and signed by the governor of Kansas, became effective on February 7, 1941, is an act constituting and classified as 'special legislation,' and the same is not repugnant nor contrary to any of the provisions of the constitution of the state of Kansas. And no section or portion of said act is repugnant nor contrary to any of the provisions of the constitution of the state of Kansas. Said act became on February 7, 1941, and still is, a valid and subsisting and enforceable law of the state of Kansas."

The court entered judgment setting aside the temporary injunction and denied the permanent injunction prayed for by plaintiff. This appeal followed.

Section 17, article 2 of the constitution of the state of Kansas, provides:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted; and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state."

Special legislation is not prohibited by this provision of the constitution. In *Murray v. Payne,* 137 Kan. 685, 21 P. 2d 333, the law was formulated in the following language:

"The constitutional provision quoted does not prohibit special legislation. Only laws of a general nature shall have uniform operation throughout the state, and when a general law cannot be made applicable, special legislation to accomplish desired ends is permissible. Whether a law is repugnant to the provision of the constitution is a matter to be finally determined by this court. The question is usually one of classification, and in such cases the court must determine whether sufficient differences exist to make distinctions substantial. In doing this the court must consider the nature and purpose of the legislation and the conditions and circumstances under which it was enacted." (p. 687.)

For similar expressions, see *State, ex rel., v. High-school District,* 112 Kan. 616, 618, 212 Pac. 69; *Wyandotte County v. Kansas City,* 112 Kan. 639, 643, 212 Pac. 70; *State, ex rel., v. Wyandotte County Comm'rs,* 140 Kan. 744, 748, 39 P. 2d 286.

As stated in *Murray v. Payne,* supra, in determining whether a general law could be made applicable, we must consider the nature and purpose of the legislation and the conditions and circumstances under which it was enacted. Obviously, in the consideration of this question, we are concerned, not with form, but with substance. We look not merely to the expressions in one sentence or one section, but to the purpose of the legislature upon an examination of the act as an entirety. Was the end to be accomplished legitimate? If so, the act may be supported as valid special legislation, although formulated in language ordinarily applicable to a general law. The trial court found the act applied only to Johnson county and was passed by the legislature to meet a national emergency. There is ample justification for the finding in the record.

The court found there was no reasonable probability that any other county in the state would ever be situated so that it could be classified under the provisions of section 1 of the act. We are unable to say this conclusion is wrong.

The act was passed by reason of the national emergency. A lawful and legitimate purpose was to be accomplished. That purpose could not be fulfilled by a general law applicable to other counties in the state within the classification of the act. We are clear the act was special legislation. We are equally clear from the records before us that the act does not violate section 17, article 2, of the constitution of the state of Kansas. The trial court so found, and we approve the judgment.

The judgment is affrmed.

Hoch, J. (concurring): With commendable frankness the appellees concede that the act under scrutiny is wholly special in character, although it wears, however artificially, the form of a general law. They agree that at the time of its enactment everyone fully understood that the act was intended to apply and would apply solely to Johnson county. Moreover, the facts and circumstances, as set forth in the findings of the trial court, were clearly of such a character that a general law could not well have been made applicable. Such being the case, no reason appears why the draftsman thought it necessary, apparently, to obscure the enactment's character as a special act and by artificial and arbitrary provisions make it sound like a general law. Had this not been done, it would not now be necessary for this court to look through and behind the disingenuous provision that the act "shall apply only to such counties in the state as shall border on or be contiguous to two cities, each of which shall have a population of more than 115,000, and located either within or without the state of Kansas," and find the real purpose and nature of the enactment. That purpose being lawful and proper, and a special act being required to make it effective, the act does not contravene the provisions of article 2, section 17, of the constitution. It would be unfortunate, however, in my opinion, if this decision were to be regarded as any sort of approval of the bad legislative practice of enacting special acts under the guise or disguise of general acts. The practice, perhaps harmless at times, has too often been employed in an artful effort to accomplish selfish ends that could not otherwise be accomplished. I venture, therefore, to repeat what I said in a dissenting opinion in the recent case of *Rural High School v. Brown County Comm'rs*, 153 Kan. 49, 54, 109 P. 2d 154. "If a local situation exists which properly calls for legislative attention and the particular facts make a general law inapplicable, there is no reason why it should not be openly and frankly presented as such, and there is nothing in the constitution which would invalidate it simply because it is special in character."

A brief additional word on the question of constitutionality here presented: the findings of the trial court and the instant opinion of this court make frequent reference to "emergency." Some of these references may seem to carry the idea that the existence of an "emergency" or a legislative or judicial declaration that an "emergency" exists clothes the legislature with power to act. If that in-

ference or conclusion is implicit in anything that has been said, I cannot subscribe to the argument, and in my opinion it would be a dangerous principle to enunciate. Emergencies may provide the *occasion for the exercise* of legislative power, already existing, but the emergency *does not create* the power. (*Home Building & Loan Assoc. v. Blaisdell,* 290 U. S. 398, 78 L. Ed. 413, 88 A. L. R. 1481, 1488.) The existence of grave dangers threatening the nation is concededly the occasion for the expanded program of national defense and for the location by the federal government—as an incident of that program—of an airport in Johnson county. All this is pertinent in narration of the facts. But as far as the constitutional power of the legislature to enact the instant measure is concerned, the issue does not turn, in my opinion, upon any consideration of "emergency." It turns wholly upon the essential fact that the establishment of this airport, a lawful project in the public interest, requires the conferring of special authority upon officials of Johnson county, and that the particular circumstances make it a case where a general law would not be applicable.

DAWSON, C. J., and WEDELL, J., join in the foregoing concurring opinion.